Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable United States Court of Appeals of the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and His Honorable Court. Let's be seated. And good morning. Welcome to the Fourth Circuit Court of Appeals. We have three cases that we will hear for argument this morning. And we'll begin with the case of Zinski v. Liberty University. Mr. Stata, did I pronounce that correctly? Yes, you did. Good morning, Your Honors. May it please the Court, the order below should be reversed, because Title VII, the First Amendment, and RFRA protect Liberty University's religious-based employment decision. Upon application, Zinski affirmed the doctrinal statement while remaining in open rebellion to it, having taken female hormones for at least four months. The plan was to work through the probation period and then tell Liberty, although Zinski admits that the plan was revealed to some co-workers. Zinski also admits that female hormones cause visible external changes and wanted to let HR know. Let's focus on the issues here. I think what you're proffering is interesting and a nice little extra commentary, but there's some legal issues here. And the factual issue is that as it stands, as I understand it, an individual was employed there. And during the course of that employment, certain representations were made. Is that correct or not? The Zinski was employed there, went through the 90-day probation, was given the doctrinal statement that was very clear that is relevant to the issue of this case that is before the Court. That doctrinal statement is listed in Liberty's letter to Zinski. Zinski wrote a letter to Liberty in which Zinski states that Zinski had already been taking female hormones. That's an absolute violation of the doctrinal statement before the application. And by the time the 90-day probation period expired, Zinski had been taking female hormones for seven to eight-plus months, knowing that that was in violation of the doctrinal statement, and then asked Liberty to set aside its doctrinal statement, which Zinski received, in favor of a different theology from Zinski's own church. Liberty then made a religious-based employment decision that it had no choice but to uphold its doctrinal statement and thus terminated Zinski, who concedes in the brief that Zinski is not a co-religionist to Liberty's faith. In terms of how we consider the issues, you, I think, said Title VII, First Amendment, RFRA. It looks to me from the briefing that when you talk about First Amendment, one of the ways you do that is framed as ecclesiastical extension, which, when I read it and I read the cases, seems to be, if not the same, part of the church autonomy doctrine. That's correct. Do you have a position on whether that must be decided first before any statutory issues are decided? Let me say it more specifically. Is it a threshold-type issue that must be decided first? Normally, we would, you know, we might consider constitutional avoidance and look to statutes before constitutional issues if those could resolve it, but if it's a threshold issue in the realm of the court's power, maybe it should go first. Do you have a position on that? Yes, Judge Qualterbaum. I don't think it's a threshold position per se. Palmer, in fact, was presented with both Title VII and the other constitutional issues, and instead of going to the constitutional issues, went to the Age and Discrimination Act. However, this court differed in the Billard case, and instead of doing the constitutional avoidance, did a reverse. None of those really grappled with whether it, maybe implicitly they were saying it wasn't a threshold issue by the way they handled them or not, but some courts have talked about it as almost jurisdictional-esque because it involves potentially the court's power. It sounds like you're not saying that. Well, I agree, Judge Qualterbaum. It does involve the court's power, and in that respect, it is jurisdictional. In this case, clearly what we have are two individuals, one of whom admits is not a co-religionist to Liberty's Faith, wants to change Liberty's Faith and supplant the doctrine of the church that Zinsky attends in favor of Liberty's Doctrine in the doctrinal statement. So that is the essence of the church autonomy doctrine, that Liberty has the ability to… If that's true, if I could just follow up on that. There are cases going back to Watson in the 1800s that talk about the ability of the church to order its affairs, make decisions without involvement of the state. But at least in terms of Supreme Court opinions, I think I'm right that none of those have applied this doctrine in the type of case we have here in terms of hiring or firing someone who doesn't… Well, assume this person doesn't qualify for the ministerial exception in this question. I think you dispute that, but just assume for the sake of discussion that's not applicable. To hire or fire someone who doesn't qualify for the ministerial exception, I don't think there's a Supreme Court case that has applied church autonomy in that context. First of all, is that correct? To my knowledge, that's correct. In fact, there's not a Supreme Court case on a number of the issues before this court, including the Title VII, 702, 703, as relates to this issue. Why do we even have then, if the church autonomy doctrine works as you say it works here, what's the purpose of the ministerial exception and does it do any work at all? Yes, the ministerial exception is a little bit more narrow, but when it applies, it's broad. The ministerial exception looks at the individual employee based upon what that employee does, the function of that employee, as to whether they are communicating a religious mission and message of that employer. And if that's the case, then none of Title VII applies. So it's narrow in its origination, but broad in its scope once it applies. I wanted to follow up on where he's headed. You're using both sections 702 and 703. Texturally, they seem to be almost the same. But if we adopt your interpretation in this case, wouldn't the plaintiff, the defendant, Zinsky, have the right to challenge any pretextual issues? And where I'm going is, this is not a motion to dismiss. We don't have any discovery. We don't have anything except a complaint. And then your motion, that's all we've got in this case. Judge Floyd, 702 and 703 now operate essentially the same. They didn't always. 702 was amended in 1972 to remove the word religious before activity, so broadened its application. But 703 has been the same since 1964 and always applied to educational institutions, thus giving them even broader freedom of religion to exercise their mission as it relates to employment. And so because they teach people, and they teach people not just through the classroom and curriculum, but through their employees. Now, Rayburn actually cites 702, not 703. So Rayburn doesn't control this case because it never addressed 703. But Rayburn does cite the Fifth Circuit Mississippi case, the Baptist case, and says that when there are different faiths involved, 702 at a minimum divests the EEOC and thus courts of jurisdiction. That's a Fifth Circuit case. And as I believe, the Third, Sixth, and Ninth Circuit take a little different position. I don't know what ours should be, but my basic question to you is, as Judge Quattlebaum started out a while ago, it just seems to me that it's going to force us to rush to judgment in something that we don't need to do right now. So it needs to be massaged a little bit with discovery and that sort of thing. Judge Floyd, with respect to the district court's finding below, the district court found that there was no dispute in the facts. It's plain about Liberty's doctrinal statement. It's plain why Liberty took its position. It's outlined in a very detailed letter that's in the record. That's not in her complaint. In her complaint, if you look at her complaint, it's just a straightforward Title VII, and that's all we're entitled to consider at this point, isn't it? No, Your Honor, and in fact, Judge Moon correctly found that this was referenced in the complaint, both the letter from Zinsky to Liberty and Liberty's letter back to Zinsky. And then in the motion to dismiss, those letters were attached, and there's case law from this circuit, which Judge Moon cited correctly, that those could be considered in this 12B motion to dismiss. And that is before the court, and that is not disputed. I guess you referred to the Joint Appendix, page 16, which is Zinsky's follow-up email to Liberty. That's not in the complaint, is it? It's in the record because it was put in the motion to dismiss, and that is part and parcel of what can be considered because it was referenced in the complaint. Zinsky brought the letter that Zinsky sent to Liberty before the court by referencing it. Zinsky brought the letter that Liberty responded to in the complaint by referencing it. Those are the actual letters. There's no dispute in this case that those are the letters. The facts of this case as relates to Zinsky's hiring, getting the doctrinal statement, the 90-day probation, the transition, the hormones, the change of the name, and Liberty's position about why Liberty took its action is clearly undisputed. So in this particular record, there is no facts to discover. And that's the reason why the judge below certified Section 702 and 703 as legal issues that would dissolve and decide this case because there's no factual disputes that need to be resolved. In fact, in this particular case, Judge, you mentioned some of the circuits that went the other way on 702 and 703. Respectfully, I don't think any of the circuits have really addressed this issue post-Bostock. Bostock says on 682 in a sex-based discrimination case that the Congress enacted broad statutory exemptions and protection for religious freedom. The concern was in the amici before the Supreme Court in Bostock was that a decision going the way Bostock eventually did would cause religious freedom issues. And the court assured in its decision that 702, 703 are broad statutory exemptions, but that's not before the court at the time. And it also indicated that RFRA was a broad statute, a super statute that supersedes and amends all federal law. And that also would result in a different outcome. So therefore, to the religious amici, you've got other defenses to bring before the court. Well, see, I'm not sure I'm there with you on RFRA because it doesn't state it's an action against the government. And again, that goes to my misogyny question. Plus, the other issue that concerns me, you may win at the end of the day. The question is, do we rush into it right now? We also have Justice O'Connor's Roberts v. J.C.'s on the effects on the church autonomy doctrine and the commercial nature of your school. Well, there's no issue about the commercial nature of Liberty University. It's a nonprofit Christian university. No, no, I don't mean it that way. I mean, you go out into the market and you get people who are not necessarily like all of your institutions. There's no dispute to what Liberty does, and there's been no dispute or argument from the plaintiff at any moment with regards to Liberty. Liberty, by the concession of all parties and noted by the judge below, qualifies under 702 and especially under 703. And in fact, the Third Circuit in Curay-Kramer regarding the issue of Title 702 applying to a religious organization, in that case abortion, rules in the same favor of what we've argued. Little does, too. The Third Circuit, the marital conduct case, also the Mississippi College case, which Rayburn cited from the Fifth Circuit, the Baptist Memorial case from the Sixth Circuit regarding homosexuality, all sided with religious employers because that behavior, those activities of abortion or supporting abortion, marital conduct or homosexuality or same-sex marriage, all of those observable behaviors like you have here with Zinsky, with observable behaviors, which Zinsky states the female hormones will cause external changes. Those then, in those cases, they found that 702, 703, or primarily 702 protects the religious employers. And also in the Seventh Circuit, in the Starkey case, Judge – Counsel, can I interrupt you there on the 702 issue? Zinsky's counsel references the fact that the language reads that the subchapter shall not apply to a religious organization with respect to the employment of individuals of a particular religion and that individuals of a particular religion is – of a particular religion is modifying individuals. In this particular case, the letter suggests Zinsky's faith is part of or supports the transition that is being undergone. But, you know, are we looking at the religion of the employee or potential employee or are we looking at the religion of the employer? We're clearly, Your Honor, looking at the religion of the employer. 702, 703 apply to the employer being able to maintain, based on First Amendment principles that you mentioned earlier, the church autonomy doctrine, its religious mission. I think, unquestionably, the church autonomy doctrine references employers. I'm trying to – what's your response in the text to how it's the employer's religion that we look to versus the employee's? Well, take, for example, 702. 702 has the BFQ in the first section, the bona fide occupational qualification. And so if that applies, and it's a necessary aspect of the business, you can discriminate on the basis of race or, I should say, not race but sex. The second part of that then refers to the religious educational institution. If the religious educational institution qualifies, as liberty does, and nobody disputes that in this case, then Title VII doesn't apply as it relates at least to religion. Now, whether it relates to other issues – Does it relate to religion generally or does it relate to the employment of individuals of a particular religion? It relates to the employer employing individuals of a particular religion. In other words, the employer has the right to have co-religionists as employees that are in line with the faith and doctrine of that employer. And those employees that are not in line, the employer can disassociate from them, as in this case. Zinsky was bringing forth a competing theology from Zinsky's own church. Does that matter? What if Zinsky didn't say anything about a church? Zinsky just says, I'm transgender, doesn't have anything to do with a religion. Would that make any difference? No, it wouldn't. I think it adds to this particular case and makes it – if liberty can't win on a case like this where you have religion versus religion, then Title VII means nothing to anybody. So I think it makes it even stronger for liberty's case. But it's not necessary for liberty's case. Can I follow up with one more question? Sure you can. I know your time's up. I had to ask some questions early about what – if the church autonomy doctrine prevents courts from reviewing this type of decision, and if you assume Zinsky doesn't fall within the ministerial exception, then what's the point of the ministerial reception? And you said that it's more narrow, but it's broader. And I understand it's more narrow, ministerial qualifications, folks who qualify. What makes it broader? And Judge Floyd mentioned pretext. Is that a limiting principle? I mean, what's different about it besides who qualifies? The ministerial exception actually is grounded in the church autonomy doctrine. And so the cases from the Supreme Court, Hosanna Tabor and Our Lady of Guadalupe, actually reference some of those church autonomy doctrines. So it grows out of that. I think the church autonomy doctrine is actually even broader because it doesn't just apply necessarily to employees, employer relationships, but to other kinds of governmental interference that may not be employment-related. So I think it includes employment but goes beyond employment. Whereas the ministerial exception builds on that church autonomy doctrine to specific individuals who are considered ministerial in that employment environment. And then once that applies, that particular Title VII completely drops out. For any reason, the employer can make a decision. But you're saying Title VII drops out for non-ministerial employees, aren't you? I'm saying Title VII drops out for non-ministerial employees in 702 or 703 if the decision by the employer, as here, is based upon religion. Not if it's based upon something else. So, for example, if a religious employer made a decision regarding sex discrimination that's not related to their religious-based theology, that doesn't drop out. That still applies. But if the employment decision is religiously motivated, then Title VII drops out as it relates to that individual. Last thing, and I'm sorry for going on. Is it your position that with the ministerial exception, courts don't look at it at all? That's the point, right?  It doesn't have to just be a religious decision. It's the nature of the position? That's correct. If it's a ministerial position, then that ends the matter. All right. Thank you, Mr. Staver. You have a few minutes for rebuttal. We'll be hearing back from you again. We'll hear from the Appellee here, Mr. Callahan. Good morning, Your Honors. Can you hear me? Excellent. All right. May it please the Court. Matthew Callahan from the ACLU of Virginia on behalf of Plaintiff Eleanor Zinsky. I'd like to begin by addressing the state of the case, which the panel has already asked about. This isn't the motion to dismiss stage, and there are, in fact, disputes of fact. The District Court identified several that would go to the ministerial exception defense and the other defenses asserted in this case. In addition, the doctrinal statement, while excerpts of it were introduced in the letter from Liberty University to Ms. Zinsky, the entire text of it does not appear in the record right now, and there are further issues with invoking the doctrinal statement. Ms. Zinsky believes that the version that she signed when she started her employment at Liberty University did not contain the language considering transgender status. Mr. Staver began by saying there, at least on some point, he acknowledged that there are issues before us today that the Supreme Court has not addressed, some of which probably the Supreme Court intentionally deferred for future look or just avoided having to deal with. But now they bring a set of contentions perhaps never brought before courts before, and regarding Title VII, what in particular, in your opinion, is their contention that stretches beyond what the Supreme Court has said, not what they would do, but what they've said thus far? Well, Your Honor, it's the extension of 702 and 703 to cover all of the bases of discrimination under Title VII. So those sections have been applied by the Supreme Court, by other circuit courts, to bar claims of religious discrimination, and that was the historical understanding of how far those exemptions spread. That can be seen by the fact that the language there, employees of a particular religion, individuals of a particular religion, parallels the initial statute's establishment of liability under Title VII, which prohibits discrimination on the basis of an individual's religion. So the parallel there cabins 702 and 703 to religious discrimination claims. Title VII has, what the courts have recognized, protected classes in there. And how does that play in here if, at least from their perspective, how do you see the outcome if we rule in their favor, how that will be dealt with? In other words, if that religious motivation is established at the beginning, how do you view that as playing out from their perspective and the perspective you think currently exists, at least from the non-statements of the Supreme Court? Well, Your Honor, I think under the Bostock test, there's no limiting principle that Liberty has announced that would stop 702 and 703 from being applied to discriminations on the basis of race, on the basis of sex, on the basis of national origin, much more broadly. So it would effectively exempt religious institutions from Title VII with respect to every protected class that's mentioned in the statute. And that has not been the historic understanding of Title VII, where the robust protections of Title VII are compelling government interest. Is it the historical perspective of Title VII or the historical perspective of a particular protected class? In other words, from a historical perspective, how the Court has treated race as opposed to sex, or does it deal with the entire statute? Well, Your Honor, I think their arguments apply equally to race-based claims. So a ruling for them would open the door to religious expressions on the basis of race, and I think the Supreme Court in the Bob Jones University case saw a religious institution that was willing to take its position against interracial marriage all the way up to the Supreme Court on the basis that it was religiously motivated and that it should be exempted from federal law. So in the wake of a decision finding 702 and 703 apply to all the bases of discrimination under Title VII, we should expect to see the same kind of case recur. And with a rule in favor of religious institutions, it would come out the other way. Just a couple more questions. Religious motivation, how do you define that? Well, Your Honor, I don't think that it needs to be defined. Bostock has a test for sex discrimination that's a but-for causation test. So whether the sex is the basis of an employment decision because of a religious motive or because of a nonreligious motive or because of a religious motive that correctly interprets doctrine or incorrectly interprets doctrine, none of that's relevant under Bostock. So the test is not about religious motive, and that's one of the reasons why Liberty keeps trying to invoke a religious motive here. I'm a little more interested from this point of view that I assume she's not a ministerial employee. And so if that's the case and Liberty goes out into the commercial market and hires people like her who don't belong necessarily to their doctrinal position, I guess by rushing into this thing, I'd like to know your position on if she's a nonministerial employee, is there a chance that in extending Bostock that employers may have to comply with governmental regulations for nondiscriminatory conduct? Yes, Your Honor. In the commercial sense out there. Yes, Your Honor. The employment relationship has special status. Is that something that could play in this case or doesn't play or am I just out on a limb? No, Your Honor, that's the boundary between the ministerial exception and the kinds of employment actions undertaken by religious institutions that are still subject to federal law under the Smith test. Is that in play in this case? Well, that's the boundary that this court should be sticking to. In other words, we don't think that Fourth Circuit or Supreme Court presidents can support a church autonomy right to hire and fire nonministerial employees, employees who don't qualify for the ministerial exception. So you agree, counsel, there is a church autonomy doctrine that protects religious organizations from judicial review of certain decisions, correct? Yes, Your Honor. And that includes decisions related to individuals that fall within the ministerial exception. You agree with that? The ministerial exception is the application of the church autonomy doctrine to employment. Correct. And you agree with other things such as church internal discipline, church decisions on doctrine and ecclesiastical matters. You agree there's a church autonomy doctrine that prevents courts from looking at those sorts of things, correct? Yes, Your Honor. And your position is that that doctrine stops at employment decisions that are religiously motivated if it has the effect of discriminating against a protected class? Well, Your Honor, the constitutional protection stops at the boundary of the ministerial exception. Who says that? Well, Your Honor, I think that's the test the Supreme Court has applied. The district court noted if there was a church autonomy right to discriminate in the hiring of nonministerial employees, there would be no need for the ministerial exception. Well, that's, and I asked your colleague questions getting at that point. The response was those are different things. There is, in the ministerial exception, it's a total hands-off. You don't really look to see whether it is religiously motivated. You don't look at things like pretext. In other words, it's a more narrow group of people, but it's a broader protection. So the answer would be, yeah, there is a difference. There is a need for a ministerial exception. You may disagree with that, but the position would be it covers a broader swath of people, but it's subject to some limiting principles, at least that it's a religious decision and not pretextual. Well, Your Honor, I think that's a distinction without a real difference in operation here. We have Liberty University and the other religious institutions advancing this kind of nonministerial church autonomy right, saying that once a church or religious institution invokes a religious motive, there's no power of the court to inquire about that religious motive. So that would mean, though, I mean, look, I think you raise some concerns that, you know, the application of this could result in it being applied to racial discrimination, and I think that I appreciate that concern. The flip side of that is that, as you see it, a church that believes transitioning is contrary to their central beliefs must hire someone who believes as a matter of faith that transition is appropriate, so that they must hire someone that they have a 180-degree difference in terms of their religious beliefs, and they're a church. That's what you would say the law requires to happen, correct? For nonministerial employees, and it's important to remember, Your Honor, that there's a protected class of people who are the messengers of the faith who do the religious duties here, but for their groundskeepers, for their janitors, for their IT apprentices, they are still subject to federal law. It's a fundamental Christian church that has 16 employees, one of which is a janitor, must hire a transgender employee even though their beliefs are that that would be contrary to their doctrine. Yes, Your Honor. It's the employment. Employment law is like other generally applicable neutral laws and must be obeyed. Well, is it a must hire or is it cannot discriminate? Well, Your Honor, it's, yeah, exactly. They can't take an employment action to discriminate. That language, must hire, seems to force a church to do something, and when you have 16, as Judge Qualibine has alluded to, this applies in this context. That's one of the sort of exceptions there. But in this context, the limitation, if there is a limitating principle here, it has to do with the church autonomy in terms of is the court making decisions for the church? And if the church has a ministerial position, which there's some debate as well as jurisdictional affirmative defense, I think either way it applies to be a blanket, and as you've indicated, that's an exception. But there is no exception if the autonomy doctrine takes the realm of excluding it all, which means it's subsumed in it, so you don't have any true meaning to the ministerial exception. At least I'm understanding your argument to be that, but is that the line of reasoning you follow? Yes, Your Honor. The ministerial exception, we think, is the proper scope of deference to church autonomy here, and again, just as churches are required to follow other laws like traffic laws, like laws against the consumption of narcotics, even if their religious beliefs would prompt them to actively. So you have this. I mean, I think when you get down to it, there is this feeling of, well, the church should be able to hire whoever they want to hire, but they're given a special exemption for religious activities of whatever motivation. So the Constitution says if you hire someone and that person has a role that's playing within the church of religious activity, religious motivation, then, yes, you don't have to worry about race. You don't have to worry about sex, anything. You can discriminate. You can be one, I suppose, that you don't want an interracial couple there. I guess if you minister a role, you could just say, no, you married to a white person, a black person. You can't come. And what this has done over the years and why the tension is now developing is something the Supreme Court, oh, it had its chance to address this, and it just hasn't addressed it. I mean, this is not like it's coming to us the first time or that we are the only ones that are getting this question. This question has been out there for years and years and years, and now, given, I guess, the temper of the times, we're now pushing it to the level where we want to connect and say, well, you ought to be able to hire anybody. If a church has 8,000 employees, now let's say 500 of religious people, the other 7,500, I can pick whoever I want to pick and be discriminatory about it. I'm not like other people out there, even though the religious exemption is dealing with you in the practice of your religion, because churches do more now, I guess, than practice and teach religion. They really go beyond that. So whether this person is an IT person or whether someone is a janitor or someone in a non-ministerial position, that's the issue we're now confronting here, and it's a conundrum. It's a conundrum for us. You know, the lower court, as I've said in other instances, the Supreme Court could help us out on this and give us an answer. And, you know, we'll follow that law. You do know that, don't you? Whatever they tell us, we're going to do. The problem is, is when they haven't said it, and now we're put in a position where we're put with these kinds of instances where it can and cannot happen, and yet it's been working all these years, and now we are here. We're the ones that now have to flip it, and there may be a split between the Fourth Circuit, maybe the Ninth Circuit, another circuit, and it goes back and forth. Finally, one day it'll get to the Supreme Court, and let's hope we'll get an answer then, something definitive. And I'm not punting to the Supreme Court. Certainly, we'll give the answer, but I'm saying this is the kind of thing that's been around, and it's a very sharp issue that's dealing with us now, this tension of statutory constitutional law in the context of this kind of activity and the reach of churches and religions in this country, dealing with those that are in religious-type positions as opposed to non-religious positions, and how you must, you know, what you can and cannot do. I mean, I think that seems to be the tension we're in. And, Your Honor, I think that the breadth of such a ruling is important and brought up by your statements there. The hundreds of thousands, if not millions, of employees who work for religiously-affiliated hospitals, corporations, churches, could all find themselves completely without recourse under Title VII or civil rights law generally with the application of a constitutional doctrine that exempts these religious institutions from employment law generally. I'm not saying a church like St. Jude or something like that that's connected with a church. I mean, you could even go to universities in terms of what's connected with churches that our holding would apply in those instances to. I don't see Liberty's version of the church autonomy doctrine as having a limiting principle that would stop short of applying to those institutions. I mean, Liberty has a specific religious-type to it, but Wake Forest University, for instance, is a Baptist university. Duke's Episcopalian. I mean, when you think about it, there is that religious. I mean, Marquette University is a Catholic-type situation. And I'm trying to understand what that means in terms of what is the reach of where this goes in terms of who can be discriminated in an instance like that. Of course, that gets to a broader question of what is the activity that's being carried on by the church. This is not the instance here. But I'm just wondering, where is this going? Well, Your Honor, I can't answer that. That is an issue that hasn't been briefed. I think Judge Winn's making a good point. What's the scope of religious organizations or religious affiliations that would be subjected to this? Maybe certain hospitals, maybe certain schools don't qualify. Maybe they do. That's an issue we really don't have before us. And my good friend Judge Winn, he's a UNC guy. He might not know that Duke's a Methodist university, not an Episcopalian. But I do know what punting is. It sounds like you're telling us to punt this issue just like the Supreme Court punted it. To return to some of Judge Winn's other comments, the Supreme Court could have ruled on such a right in previous cases. And I think that the care that this court took in establishing the scope of the ministerial exception, without any inquiry into whether a religiously motivated discharge of these people would get out of the whole question of whether the ministerial exception applies. Well, let's ask you the same question that was asked of Liberty. What else do we have to have in this record to make this legal decision? Well, I think, for instance, the ministerial exception defense that Liberty has invoked is held to be a very factually intensive inquiry into what the employee does. At this stage, Ms. Zinsky's characterization of her duties as an IT apprentice without having any religious dimension to her duties, Liberty being happy with her performance, that's all something that the court has to credit and accept as the record for the ministerial exception in this case. In addition, there are questions of proof with regard to the doctrinal statement, as I said. We don't know which version of the doctrinal statement Ms. Zinsky signed, whether it included transgender status. She believes it didn't, but we haven't been able to locate a copy in order to prove that up. It's certainly not before this court, to the extent that Liberty's defenses depend on the contents of that doctrinal statement and her having signed it, that's not before this court to rule on at this stage. The district court identified a number of other factual places where things could be developed, and I think that a summary judgment record makes much more sense for many of the defenses here. With that, we would ask that this court remand to the district court to continue this opinion and that it not go beyond the boundaries set by the Supreme Court for the church autonomy doctrine and the employment decisions with regard to the ministerial exception and find a church autonomy right to discriminate against non-ministerial employees. Thank you, Mr. Callahan. We'll hear from you again, Mr. Stavum, for the rebuttal. It's astounding, Your Honors, that Liberty University could not enforce its doctrinal position and must hire individuals that are directly in contravention publicly through their beliefs, their observances, and their behavior. The church autonomy doctrine clearly protects Liberty's ability to have co-religionists, and the Ninth Circuit has two cases recently decided, this year and last year, the World Vision case and the Union Gospel case, both of which are church autonomy doctrine cases, both of which apply to non-ministerial individuals because the state in that particular situation, as the EEOC or Title VII would be doing in this situation, would be forcing those entities to hire someone that's totally in contravention to their faith. Both of those cases stand for that proposition. And if Liberty can't actually hire employees that are consistent with its faith, then Liberty has no faith. Liberty would be viewed as a hypocrite for having a doctrinal statement that means nothing when it teaches young people about not only in the classroom and the curriculum but also through the employees. And when the doctrinal statement says one thing, but Liberty is then restrained from actually exercising it as it relates to its employees when there's a clear, undisputed conflict, in this case, with no dispute. What is the limiting principle of a doctrinal statement? In other words, can a church? Religions can be of all things. You can actually recognize religions for the devil. You know this. And, I mean, they're religions. They get exemptions just like everybody else. And I'm just wondering, what is the limit on a doctrinal statement? Here you have a statement against transgender. Is there anything that would prohibit a church from having a statement prohibiting interracial marriage or, and I'm using race, but other things, any of the protected classes? Could it be in a white supremacist mode and it says only white people can come? Does that, is that a doctrinal, how do we deal with that in the context of where you are if there is this blanket allowance to discriminate if it's in your doctrinal statement? What is the limiting principle on a doctrinal statement? Is there, I should say. I think there is to some extent. Courts have to be careful not to second guess or debate doctrinal statements just like sincerely held religious beliefs, as long as it's sincere. Liberties, in this particular case, has a very specific doctrinal statement. It's quite clear. It's not against trans. It actually says God created. I'm not challenging the sincerity of this statement. What I'm saying is if we apply it here, how does it not apply to another institution that doesn't have your kind of core values of saying we won't do that, but they can. You know, you understand what I'm saying? They can have a statement in there, and we legally cannot differentiate the two unless you tell me how it is we do it. When the next person that stands up here says to us, well, we have a doctrinal statement that says that no people, we will only allow certain types of people to come in here. And that is something you would not put in yours. I do not believe for one moment you would put it in there, but someone else could. But legally, the propositions are the same. So how do we differentiate when that case comes to say, no, we're not talking about that case. How do we do that? Judge Wayne, I see I'm out of time. May I respond?  I think there's a limiting principle, and there's not this parade of horribles that this will apply to race because unlike sex, you have a specific constitutional amendment that comes into play with regards to race. So I think even if you have a doctrinal statement that is racist in nature, you have a competing constitutional provision. The First Amendment protects liberty because of autonomy, ministerial exception, and certainly that's the basis for Title VII. But also a competing constitutional amendment is that regarding race. And consequently, I don't think there's this parade of horribles that this is opening up the racial discrimination door. No, it doesn't. It applies in a very narrow situation. For example, Title VII, the 702, 703, very narrow. When the decision is based religiously on a clearly defined, in this case, doctrinal statement, then when that religious decision is made, then Title VII doesn't apply in this particular case as it relates to sex discrimination. And I think Bostock on page 682 clearly says that because why would the Supreme Court? It hasn't answered the question, but I'm sure it certainly will. Maybe this might be the case, Judge Wendt. Let me ask counsel if you have further questions. Judge, I'm sorry. Counsel. That's all right. I did that for a while. In terms of limiting principles, I was going to ask you about your view about how your position related to race, and you've answered that. Some courts that have looked at the church autonomy doctrine as you advocate applies here have said there is a pretext limitation. Do you agree with that? No, I don't agree that there's a pretext. In terms of doctrine, perhaps, but once the doctrine applies, the church autonomy doctrine, no. And I think that courts have to be deferential to that doctrine, just like you're deferential in an employee bringing a sincerely held religious belief allegation for religious discrimination under Title VII. It's basically whether that is sincere and not a sham, but it doesn't get into debating the particular details of that faith. Right. Okay. So you disavow a pretext limitation on the church autonomy doctrine? I do, Judge Quattlebaum, because I think what that does is exactly opposite of what the church autonomy doctrine is designed to do. It invites second-guessing. Exactly. It invites second-guessing. Is that really true? I mean, I can certainly see that how you would go about pretext could become court second-guessing church decisions. I guess I'm trying to see whether there's pretext that would not involve that. I don't think so, because pretext can become its own litigation. And litigating under the context of pretext is going to open up all the discovery and all the different faith and all the different employees and everything out on the table could go on for years just on pretext. But why isn't that why it's different than – I mean, church autonomy doctrine has a number of components.  Some of them are ministerial exceptions. Some of them are church disciplines. Some of them are doctrinal statements. And maybe there's total hands-off on those. But for something that involves here, I wonder whether some discovery into pretext would not be inconsistent with that. I think it would be inconsistent. Say, for example, if you have the church autonomy doctrine in discipline, there could be all kinds of allegations back and forth, why the person is disciplined, why the person shouldn't be disciplined, whether that discipline was pretext. That immerses the court in a wrong situation. So your view then is that – back to ministerial exception – is if it's a religious decision, you have church autonomy doctrine. If it's ministerial exception, any decisions – we don't even look to see whether it's a religious decision. That's correct. And in fact, in this particular case, the church autonomy doctrine is very simple because what we have is two competing religions. We have Zinsky's religion. I understand. This case, depending on your perspective, may be simple, but we've got to make a rule that applies to things that aren't so simple.  Judge Floyd. I have one other question. Just correct me if I'm wrong. She was hired and there was no issue about this transgender – no issue about transgender. This occurred after she was employed and she began to – No, Judge Floyd. When Zinsky was hired, Zinsky was presented the doctrinal statement. The letter from Liberty after the 90-day probation actually says that Zinsky was presented the doctrinal statement, reminded Zinsky that Zinsky received the doctrinal statement, and confirmed that. Zinsky has never, even up until now, just a few moments ago, challenged that. Zinsky received the doctrinal statement. The doctrinal statement was clear, and then as a result of that, 90 days later, came out in open defiance of that doctrinal statement, and that's when Liberty made a religious decision to terminate Zinsky. The reason I ask that question, we've been talking about churches being forced to hire. I want to know whether she had been hired and there was no issue and then terminated. Zinsky was hired on a false representation by Zinsky. If Zinsky had complained about the doctrinal statement when Zinsky was presented with that doctrinal statement, which Zinsky acknowledged and that was mentioned in the letter to Zinsky, then Zinsky would have never been hired. Let me follow up this way. Let's suppose – let's talk about another employee, X. No issue at all. You hire, and then they begin this transition. After probation, just down the road at some point in time. Would your action be the same? Yes, it would be. In this case, it's an easier situation because Zinsky began the transition before, signed the doctrinal statement, in open rebellion to it, and then waited the 90 days to reveal the ultimate plan. But if Zinsky actually signed the doctrinal statement and agreed with it at that time, and then went through probation and, say, worked for a couple of years, and then Zinsky decided to do the same thing, the same result would happen because Zinsky would now be in open rebellion by belief, observances, and activities against the doctrinal statement, even though that happened afterward because the doctrinal statement has to protect Liberty's ability or any other religious organization's ability to hire and maintain employees that are co-religionists. By Zinsky's own admission, Zinsky is not a co-religionist. Zinsky's of a different faith and wants to supplant Liberty's faith with the faith of Zinsky's church. So church discipline at that point would not be an issue. It'd just be the doctrinal statement. It would be the doctrinal statement that the person may have been in compliance with, assuming hypothetically at the beginning, and then became noncompliant with that. In fact, that's the cases that I mentioned before with regards to the supporting abortion. That's the Curay-Kramer case from the Third Circuit, and also the marital conduct, somebody who was divorced but didn't get the proper enrollment. That came afterward. I want to thank you for that. The reason I'm doing this is because we have two other cases. I know. You've got a full bracket. There's some overlapping in these issues, so I think the two of you, you and Mr. Callahan, you've done a wonderful job of setting the stage not only for your case but for cases to come, and we look forward to hearing those arguments, but thank you very much. We're going to come down. Thank you, Your Honor.
judges: James Andrew Wynn, A. Marvin Quattlebaum Jr., Henry F. Floyd